IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEXIS HERNANDEZ AVILEZ,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR, et al.,<br><br>Defendants. | Case No. 19-cv-08296-CRB<br><br>**ORDER DENYING TEMPORARY RESTRAINING ORDER** |

Lexis Hernandez Avilez claims her detention by Immigrations and Customs Enforcement is unlawful, because her recent transfer to a facility in Texas interferes with her right to counsel, because she has not received medically necessary treatment for gender dysphoria, and because she is entitled to a bond hearing under Ninth Circuit caselaw and 8 U.S.C. § 1226(a). Avilez requests a temporary restraining order or preliminary injunction requiring the Government to either release her or, alternatively, return her to Yuba County Jail ("Yuba") and provide her with a bond hearing. The Court lacks jurisdiction over Avilez's right-to-counsel claim, she has failed to demonstrate a likelihood of success on the merits of her claim to constitutionally required medical treatment, and a TRO is not the proper device to address the remaining issues. The motion for a TRO is therefore denied.

## I.  BACKGROUND

Avilez is a native and citizen of Mexico. Beier Decl. (dkt. 13-3) Tab A ¶ 1. She was brought to the United States as an infant and has lived in this country since. Id. ¶ 4.

In 2005, Avilez was convicted of assault and sentenced to sixteen years in prison. Id. ¶ 16. After her release, Avilez was transferred directly to ICE custody at Yuba. Id. ¶ 20; Mot. (dkt. 13-

2) at 3.  On March 8, 2019, an immigration judge denied her application for relief under the Convention Against Torture and ordered her removed to Mexico.  Mot. at 7.  The Board of Immigration Appeals affirmed and entered a final order of removal.  Id. at 8.  Avilez then filed a petition for review ("PFR") with the Ninth Circuit.  Id.  That petition remains pending.  Id.  The Ninth Circuit has stayed Avilez's removal pending resolution of her PFR.  Id.  Avilez has been in ICE custody since her release from prison.  Beier Decl. Tab A ¶ 20.

Avilez was assigned male at birth.  Id. ¶ 17.  While in ICE custody, Avilez realized she was a transgender woman and was diagnosed with gender dysphoria by Yuba's medical staff.[1]  Id. ¶ 23; Beier Decl. Tab F; Mot. at 4.  The parties agree that Avilez requires hormone treatment to address her gender dysphoria.  Mot. at 5–6; Opp'n at 3–4.  However, they characterize the course of her treatment somewhat differently.

According to Avilez, she has "for months, been denied necessary medical treatment for her gender dysphoria."  Mot. at 5.  She has been denied women's undergarments and hormone treatment.  Id. at 5–6.  And, adding injury to injury, she was transferred without warning to Prairieland Detention Center ("PDC"), in Alvarado, Texas, away from her support system and lawyer.  Id. at 6.  The staff at PDC housed her in an isolated medical holding cell, do not plan to house her with female detainees, and (sometimes) calls her by her male name.  Id. at 6.

The Government tells essentially the same story, but casts it in a very different light.  According to the Government, ICE determined in September 2019 that hormone treatment was medically necessary.  Opp'n at 3.  However, Yuba does "not have the capability to administer this medical care itself and was unsuccessful in its efforts to locate a third-party health care provider . . . to do so."  Id. at 3–4.  ICE therefore began looking for a facility that could house Avilez and provide her with the necessary treatment.  Id.  PDC was the only detention center capable of providing the necessary care and willing to house a detainee with Avilez's gang affiliations and criminal history.  Id.  Because hormone treatment was medically necessary, PDC's ability to provide that care outweighed Avilez's preference to be housed at Yuba.  Id.

---

[1] Avilez's status as a transgender woman is the basis for a pending motion to reopen with the BIA.  Mot. at 8.

2

Avilez is currently housed in a single occupancy observation cell which she may leave for recreation and meals. Id. at 4–5; Joint Status Report (dkt. 29) at 4. She has declined to be moved, at least for the time being. Joint Status Report at 4. If Avilez changes her mind, PDC is willing to integrate her into the female population, except for bathroom and sleeping purposes. Id. Hormone treatment will start shortly. Id. at 3–4. Avilez is currently scheduled to meet with endocrinologist Dr. Jessica Abramowitz on February 6, 2020. Id. at 3. Dr. Abramowitz will "evaluate blood work, order additional labs if necessary, and educate Ms. Avilez on hormone therapy." Id. It is possible that a prescription for hormone therapy will start as soon as Avilez's first appointment with Dr. Abramowitz. Id. The Government also states that PDC will provide Avilez with female undergarments as long as doing so does not pose a safety risk, and that it is ICE policy to refer to detainees by their preferred names and pronouns. Opp'n at 13.

Avilez filed the instant motion to challenge her transfer to PDC and request release or a bond hearing. Mot. at 24.

## II. LEGAL STANDARD

A TRO is an "extraordinary remedy" that should only be awarded upon a clear showing that the plaintiff is entitled to such relief. See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). The party seeking a TRO must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. See id. at 20. Alternatively, the moving party must demonstrate that "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," and that the other two Winter elements are met. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1134–35 (9th Cir. 2011). The "[l]ikelihood of success on the merits is the most important Winter factor." Disney Enters., Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation marks omitted).

## III. DISCUSSION

Avilez presses three main arguments for a TRO. First, that her transfer to PDC

3

unconstitutionally interferes with her right to counsel. Reply (dkt. 23) at 3–7. Second, that ICE has unconstitutionally denied her medically necessary treatment. Id. at 7–11. Third, that Ninth Circuit caselaw and 8 U.S.C. § 1226(a) entitle her to a bond hearing before an Immigration Judge. Mot. at 11–18.

### A. Transfer to PDC

Avilez argues that her transfer to PDC violates her Fifth Amendment right to counsel, because her San Francisco-based lawyer no longer has "consistent access to phone calls with her, as he did while she was at Yuba," and cannot travel to Texas to meet with her. Id. at 22–23. This Court lacks jurisdiction over this claim, because it "arises from" Avilez's removal proceedings, and may therefore be raised only in a petition for review to the Ninth Circuit. See J.E.F.M. v. Lynch, 837 F.3d 1026, 1031 (9th Cir. 2016).

8 U.S.C. § 1252(a)(5) prescribes "the sole and exclusive means for judicial review of an order of removal": "a petition for review filed with an appropriate court of appeals." Section 1252(a)(5)'s reach is broad. "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." Id. § 1252(b)(9).

The Ninth Circuit has declared this language "'breathtaking' in scope," "'vice-like' in grip," and capable of "swallow[ing] up virtually all claims that are tied to removal proceedings." J.E.F.M., 837 F.3d at 1031 (citing Aguilar v. ICE, 510 F.3d 1, 9 (1st Cir. 2007)). "[A]ny issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the PFR process." Id. True, this does not include "claims that are collateral to, or independent of, the removal process," such as habeas petitions that do not involve final orders of removal or ineffective-assistance-of-counsel claims. Id. at 1032. But it does include right-to-counsel claims. Id. at 1032–33. In J.E.F.M., a class of immigrant minors claimed they had a due process "right to appointed counsel at government expense in immigration proceedings." Id. at 1029. The Ninth Circuit concluded that "[i]n light of §§ 1252(b)(9) and 1252(a)(5) and our precedent, the

4

children's right-to-counsel claims must be raised through the PFR process because they 'arise from' removal proceedings." Id. at 1032–33.

Other courts in this district have held that J.E.F.M. requires dismissal of due process claims virtually identical to Avilez's. In Alvarez v. Sessions, 338 F. Supp. 3d 1042 (N.D. Cal. 2018), Judge Davila dismissed a case in which detained immigrants sought a TRO to block their transfer to detention facilities outside of California. Id. at 1044. The plaintiffs in Alvarez "frame[d] their single claim as implicating their Fifth Amendment due process right to counsel" because their "pro bono counsel [could not] continue to represent their clients in jurisdictions beyond San Francisco." Id. at 1048. Judge Davila held that "J.E.F.M. teaches . . . that Petitioners' challenge based on the potential loss of counsel 'arises from' their removal proceedings and can only be raised through the PFR process." Id. Other district court decisions have followed this logic, and applied J.E.F.M. to dismiss claims that an immigrant detainee's transfer violates the detainee's right to counsel. See, e.g. Hernandez Culajay v. McAleenan, 396 F. Supp. 3d 477, 486–87 (E.D. Pa. 2019) (no jurisdiction over claim that transfer to Mexico under the Migrant Protection Protocols interfered with plaintiff's right to counsel). And the First Circuit has reached a similar result, in a case cited favorably by the Ninth Circuit in J.E.F.M. See Aguilar, 510 F.3d at 13–14 ("[C]laims that are based upon an alleged deprivation of an alien's right to counsel in connection with a removal proceeding, whether pending or imminent, arise from the removal proceeding.").

Avilez relies on a Central District of California case that explicitly declined to follow Alvarez and held that J.E.F.M. is distinguishable when the plaintiff claims that a transfer interferes with an existing attorney-client relationship. Arroyo v. DHS, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *12–13 (C.D. Cal. June 20, 2019). That case involved substantially similar claims that transferring the plaintiffs away from their counsel would violate the plaintiffs' right to counsel. Id. at *4. Judge Bernal ruled that this claim did not arise from the plaintiffs' removal proceedings because "an established attorney-client relationship carries with it certain rights separate from and additional to their rights in removal proceedings." Id. at *13. "Thus, represented Immigrant Plaintiffs assert harm that accrues by conduct imposing significant burden

5

on the attorney-client relationship without looking to the effect of that burden on the underlying removal proceedings." Id.

The Court finds Alvarez more persuasive than Arroyo. Arroyo is difficult to reconcile with the broad language of J.E.F.M. See J.E.F.M., 837 F.3d at 1033 ("Congress intended to channel all claims arising from removal proceedings, including right-to-counsel claims, to the federal courts of appeals and bypass the district courts."). And the distinction Arroyo draws is not persuasive. If an established attorney-client relationship carries rights unrelated to removal proceedings, it seems that would be true of prospective attorney-client relationships as well.

Because this Court lacks jurisdiction over the right-to-counsel claim, it will not reach the merits of that argument.

In her initial motion, Avilez made the somewhat distinct argument that her transfer to PDC was unconstitutionally punitive, mainly because it constituted "less considerate treatment" than a criminal detainee would receive. Mot. at 20–21. She appears to have abandoned this argument in her reply, shifting her focus to the right to counsel. See generally Reply. In any event, the Court rejects this argument. "[A] restriction is punitive where it is intended to punish, or where it is excessive in relation to its non-punitive purpose." Jones v. Blanas, 393 F.3d 918, 933–34 (9th Cir. 2004) (internal quotation marks omitted). The Government has explained that the transfer was necessary to provide Avilez with needed medical care. Opp'n at 7. Providing medical care Avilez agrees was constitutionally required surely qualifies as a non-punitive purpose, and if PDC was the nearest facility capable of providing that care, the transfer was not excessive.

Avilez contends that medical treatment could not have been the true motivation for the transfer, because the decision to transfer her to PDC "was made by non-medical professionals," she has not been provided with proper treatment at PDC, and her counsel has located a doctor willing to provide the necessary care at Yuba. Reply at 7–11. But it does not take a physician to decide that it is necessary to transfer a detainee to a facility capable of providing essential medical care. And just because Avilez's counsel was able to quickly locate a provider in the Sacramento area does not mean ICE was aware of that doctor's existence, or his willingness to provide care at Yuba. Finally, it appears that Avilez is receiving proper medical care at PDC, as discussed below.

Because the Court either lacks jurisdiction over the claims based on Avilez's transfer to PDC or finds that she has failed to demonstrate a likelihood of success on the merits of those arguments, her transfer cannot be the basis for a TRO.

### B. Denial of Medically Necessary Treatment

Avilez also argues that she should be released because she has been unconstitutionally denied medically necessary care. Mot. at 19–20. She states she has been denied hormone treatment necessary to address her gender dysphoria, and that the PDC staff has kept her in a segregated cell, denied her female clothing, and consistently refers to her as a man. Id. at 20.

It is true that in Edmo v. Corizon, Inc., 935 F.3d 757 (9th Cir. 2019), the Ninth Circuit recognized that failing to provide medically necessary treatment for gender dysphoria may violate the Eighth Amendment's prohibition of cruel and unusual punishment. Id. at 767. But Edmo is distinguishable because in that case the defendant prison completely denied the medically necessary treatment (gender confirmation surgery). Id. at 773. In this case, ICE has begun to take steps to provide the hormone treatment Avilez requires. Joint Status Conference at 3–5. And the Government avows that Avilez's other complaints will be addressed. Opp'n at 11–13. There is some factual dispute about the extent to which Avilez's gender dysphoria is being appropriately addressed by ICE. But Avilez and her counsel agree that steps are being taken to provide her with hormone treatment, and the Court declines to step in to micro-manage the details, timing, or location of ICE's provision of medical care.

In short, Avilez has failed to demonstrate a likelihood of success on the merits of this claim. However, to ensure that Avilez does continue to receive the medically necessary treatment, the Government is ordered to file a status report by 5:00 PM Pacific Time, February 10, 2020, informing the Court of the current state of Avilez's treatment.

### C. Bond Hearing

Avilez argues that she is entitled to a bond hearing before an Immigration Judge under 8 U.S.C. § 1226(a), or because her prolonged detention without such a hearing violates procedural due process. Mot. at 12–18. The Government points out that these arguments form the basis of

Avilez's habeas petition, see Petition (dkt. 1) ¶ 61, which the parties originally agreed to brief on a far more relaxed schedule than a TRO, see Proposed Briefing Schedule (dkt. 9). The Court therefore concludes that the "extraordinary remedy" of a TRO is inappropriate vis a vis these arguments for relief. At the telephonic status conference, the Court indicated that the deadlines set in the original briefing schedule for Avilez's habeas petition would be continued while her motion for a TRO was pending. The parties are therefore directed to file a revised proposed briefing schedule for Avilez's habeas petition by 5:00 PM Pacific Time, February 10, 2020.

IV. **CONCLUSION**

For the foregoing reasons, the motion for a TRO is denied.

**IT IS SO ORDERED.**

Dated: February 5, 2020

CHARLES R. BREYER
United States District Judge